```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

HARRY JACOBS, on behalf of himself and all    :
all others similarly situated,
                                              :   REPORT AND RECOMMENDATION
                    Plaintiff,
        -against-                             :   01 Civ. 8436 (JSR)(KNF)

CITIBANK, N.A., CITICORP., ET AL.,            :

                    Defendants.               :
------------------------------------------------------------X
```

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE JED S. RAKOFF, UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

In this action brought for alleged violations of The Truth In Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., and the regulations promulgated thereunder, the defendants have made a motion for summary judgment pursuant to Fed. R. Civ. P. 56.  The defendants contend that: (a) the action was not commenced timely, within the one-year statute of limitations applicable to TILA actions; and (b) the plaintiff's claim that the defendants failed to fulfill disclosure obligations imposed upon them by TILA and its regulations is wrong and, therefore, the plaintiff has failed to state a claim under TILA.

The plaintiff opposes the defendants' motion.  He contends that the applicable statute of limitations does not bar him from maintaining this action because the limitation period was equitably tolled by virtue of the defendants' fraudulent concealments.  In addition, the plaintiff alleges that disputed material facts concerning the TILA disclosure(s), if any, made by the

defendants to the plaintiff require the court to reject the defendants' request for summary judgment.

## II.  BACKGROUND

In July 1988, plaintiff Harry Jacobs ("Jacobs") and his wife made application to defendant Citibank N.A. ("Citibank") for a home equity loan known as an "Equity Source Account Loan."  The loan closing proceeding occurred on September 27, 1988.  On that date, Jacobs and his wife executed a mortgage loan note and other closing documents through which they agreed to repay Citibank the principal amount of $117,000 or such portion of that amount as might be advanced and be outstanding from time to time under the mortgage loan note plus any interest on the principal at the interest rate set forth in the mortgage loan note.  The parties agreed that the loan would have a variable interest rate.  The index for calculating the interest rate was the prime rate published daily in the Wall Street Journal.

Pursuant to the provisions of the mortgage loan note, the loan was divided into two payment periods.  The initial payment period of 120 months began when the loan closed.  This payment period was referred to as the "Interest Period."  During the Interest Period, Jacobs and his wife could borrow, repay, and re-borrow advances up to the aggregate sum of $117,000, as long as no event of default occurred.  The second payment period identified in the mortgage loan note was to exist for not more than 240 months.  This payment period was referred to as the "Repayment Period;" it began 120 months after the loan closed.

During the Interest Period, Jacobs and his wife were required to make monthly interest-only payments to Citibank.  During the Repayment Period, Jacobs and his wife were required to make monthly payments to Citibank of principal and interest.  The principal portion of those

monthly payments was to be equal to the greater of: a) $75.00; or b) 1/240th of the unpaid principal outstanding on the last day of the Interest Period. The principal portion of the monthly payments made during the Repayment Period remained fixed. However, the interest portion of those monthly payments varied, as it was equal to the amount of interest determined by the interest rate specified in the mortgage loan note, which was to be applied on the principal outstanding from time to time.

After the loan closing proceeding had occurred and the loan's recision period had expired, Jacobs and his wife borrowed $108,868.78. For ten years thereafter, they made interest-only payments on a monthly basis. It is undisputed that by September 19, 1998, the outstanding principal balance on the loan was $116,454.36. In April 1998, and July 1998, Citibank, F.S.B.'s ("FSB") Home Equity Department informed Jacobs and his wife, in writing, of the following:

> [A]s per your original agreement . . . repayment/amortization of your outstanding balance will begin on [the date specified in the respective writings]. Your existing Equity Source Account is approaching the amortization period, which requires a monthly payment consisting of principal and interest to be repaid over a 20 year period. Pre-payment may reduce the term of your loan but will not lower the principal portion of your regular monthly payments . . .
> ***
> When your account enters repayment/amortization, your monthly payments will include the sum of 1/240th of your principal balance as of the end of the access period plus interest []. Please note that you will continue to receive monthly statements which will indicate the total payment due.

According to Jacobs, the FSB letters contained a telephone number through which borrowers like Jacobs could make inquiries. Jacobs used that number to inquire about the monthly repayment amount he was being billed, which had increased from approximately $1,003 during the Interest Period to approximately $1,470 during the Repayment Period. Jacobs recalls that he was informed, when he made contact with a FSB representative, that the billed amount

"was what had been agreed to and in the absence of prepayment in full of the total principal amount owed there was no alternatives (sic) to making the schedules (sic) payment."

Jacobs and his wife defaulted on the loan. Thereafter, Citibank initiated a mortgage foreclosure proceeding, which was resolved on or about October 10, 2000. In connection with the foreclosure process, Jacobs communicated with Michael Florian ("Florian"), who managed the Foreclosure Department. Jacobs contends that Florian pledged to "work with [him] to establish how [Jacobs'] monthly payments during the Repayment Period were calculated and [to] furnish [Jacobs] with an amortization table." Jacobs recalls that he exchanged correspondence with Florian and Florian's assistant, Christie Yallally ("Yallally'), for approximately six weeks, until November 19, 2000. At that time, Jacobs became ill. Thereafter, Yallally informed Jacobs, in a letter, that she could not find an amortization table for his account. Florian also wrote to Jacobs, advising him that Florian was unable to provide further assistance in determining how Jacobs' Repayment Period monthly bills were calculated.

In September 2001, Jacobs initiated the instant action. In his complaint, Jacobs alleges that "during the period commencing September 10, 1998, and continuing until the present, [i.e., the date on which the action was commenced]," Citibank "knew or should have known that" he was no longer an open-end borrower but, rather, had become a closed-end mortgagor to whom Citibank was required to provide "notices and information that complied strictly with the rules and regulations of the TILA and Reg. Z relating to closed end mortgages."[1]

---

[1] Notwithstanding the claim in the complaint, that after 120 months the open-end loan vehicle became a closed-end mortgage, in his counter Local Rule 56.1 statement, the plaintiff alleges that the Equity Source Account Loan was, from its inception, a closed-end loan for which disclosures required by TILA and the regulations promulgated in connection thereto were

(continued...)

For its part, Citibank contends that it satisfied its TILA disclosure obligations. Citibank maintains that its "ordinary and customary practice [is] to furnish a standard mortgage disclosure statement" to customers such as Jacobs, and "to maintain separate customer loan files containing all documents related to each home equity loan issued by Citibank for the life of the loan plus an additional seven years after full repayment of the loan." In support of the defendants' motion for summary judgment, they submitted to the Court a copy of a disclosure statement that was retrieved from the customer loan file Citibank maintained for the home equity loan it made to Jacobs in 1988. However, nowhere on the disclosure statement is there anything indicating that Jacobs actually received the document. In further support of their contention that Jacobs received the requisite disclosure statement from Citibank, the defendants point to a document contained in the Jacobs loan file entitled, "ESA Legal Quality Control Check List." Among other things, the checklist contains the word "disclosure" and a check mark next to that word. The checklist bears the initials of the person who reviewed it for Citibank and the date on which that review took place, October 12, 1988. According to the defendants, the mark that appears on the checklist opposite the word "disclosure" signifies only that the disclosure statement Citibank maintains it provided to Jacobs is among the several documents contained in the Jacobs loan file made and kept by Citibank. The mark next to the word "disclosure" on the checklist does not signify that Jacobs received the subject disclosure statement.

---

[1](...continued)
required to be made by Citibank to Jacobs. According to Jacobs, Citibank fraudulently concealed and refused to give the closed-end disclosure statement it was required to provide to him "for a period of years" leading up to the filing of his complaint. As a result of that "fraudulent concealment," Jacobs maintains that the one-year statute of limitations applicable to actions initiated for alleged TILA violations was equitably tolled.

### III.  DISCUSSION

*Summary Judgment*

Summary judgment may be granted in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor."  L. B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 [1986]).

The moving party bears the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. at 323, 2553 (quoting Fed. R. Civ. P. 56[c]).

Once the moving party has satisfied its burden, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986).  In order to

meet this burden, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48, 106 S. Ct. at 2510. The non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Id. at 256, 2514. A genuine issue of material fact exists only if a rational trier of fact could find in favor of the non-moving party. See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.

*TILA Statute of Limitations*

15 U.S.C. § 1640(e) instructs that any action for damages sought for a violation of TILA must be brought within one year from the date of the occurrence of the violation. See Eubanks v. Liberty Mortgage Banking Limited, 976 F. Supp. 171, 174 (E.D.N.Y. 1997). The phrase "occurrence of the violation" means different things depending on whether the violation occurs in the context of a "closed-end" credit plan or that of an "open-end" credit plan. 15 U.S.C. § 1602(i) defines the term "open-end credit plan" as follows:

> The term "open-end credit plan" means a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides a finance charge which may be computed from time to time on the outstanding unpaid balance.

The defendants contend -- and Jacobs does not contest -- that during the "Interest Period" a finance charge was to be computed, from time to time, on the outstanding unpaid principal of the loan.

Under an open-end credit plan, a borrower typically becomes aware of a TILA violation "only when the first finance charge is imposed" by the lender. Baskin v. G.Fox & Co., 550 F. Supp. 64, 67 (D. Conn. 1982). In 1987, the Federal Reserve System's Board of Governor's ("Board") proposed amendments to the TILA regulations. In the proposed amendments, the Board explained that a home equity line of credit is an open-end credit line that is secured by a borrower's equity in his or her home. See 52 F.R. 48702-01 Supplemental Information, ¶ 1.

"Closed-end credit means consumer credit other than open-end credit . . . ." 12 C.F.R. §226.(2)(a)(10). A "closed-end" credit transaction is one in which "the finance charge is divided into the term of the loan and incorporated into time payments." Baskin, 550 F. Supp. at 66. In a "closed-end" credit transaction, the "date of the occurrence of the violation" is "the date the plaintiff enters the loan agreement or, in the alternative, when the defendant performs by transmitting the loan funds to the plaintiff." Boursiquot v. Citibank F.S.B., 323 F. Supp. 2d 350, 353 (D. Conn. 2004); Cardiello v. The Money Store, Inc., No. 00 Civ. 7332, 2001 WL 604007, at *3 (S.D.N.Y. June 1, 2001).

The Equity Source Account Loan that the plaintiff obtained from Citibank had a revolving credit feature that the creditor, Citibank, contemplated would be used on a repeat basis during the "Interest Period," the first 10 years of the loan's term. This is evident, in part, from the express language of the mortgage loan commitment that was issued by Citibank and executed by Jacobs and his wife. In its most pertinent part, that document contains the following text:

> Revolving Credit Loan. During the Interest Period you may borrow, repay and reborrow the proceeds of the Loan, provided each borrowing and reborrowing shall be in a minimum amount of $250.

Mortgage Loan Commitment, ¶19.

The revolving credit feature of the Equity Source Account Loan was also made clear in the mortgage loan note that Jacobs and his wife executed. That document provides, in relevant part, the following:

> Payment Periods. The term of the Loan will be divided into two periods: (a) an initial period (the "Interest Period") of 120 months beginning on the date the loan is closed, during which I [the borrower(s)] will have the right, so long as I am not in default under this Note, to borrow, repay and reborrow advances of Principal under this Note up to the Approved Limit then in effect . . . .

Mortgage Loan Note, ¶ 12.

When the provisions of the mortgage loan commitment and the mortgage loan note cited above are read in conjunction with 15 U.S.C. § 1602(i), it is clear that, at least with respect to its first 120 months, the Equity Source Account Loan was a variable interest rate revolving credit loan. As such, during its first 120 months, the loan had the indicia of an open-end credit plan. During its Interest Period, the loan had an interest-only repayment term; thereafter, it had a 20-year principal and interest repayment term.

In an open-end credit plan environment, a claim accrues for a TILA violation when the borrower is first assessed a finance charge. See Baskin, 550 F. Supp. at 67. In the case at bar, that would mean that the plaintiff had to bring his claim that TILA had been violated by the defendants within one year of the date on which a finance charge (interest) was first levied on him for money borrowed through the Equity Source Account Loan. It is undisputed that immediately after the loan closing proceeding on September 27, 1988, Jacobs and his wife borrowed $108,868.78 of the $117,000 principal amount of the loan. Inasmuch as repayments

were to be made on a monthly basis, Jacobs had one year from the date in October 1988 on which a finance charge (interest) was levied on him by the bank to commence any action alleging a TILA violation based on the open-end credit arrangement contemplated by Citibank. The instant action was not commenced until September 2001, approximately 13 years after the claim accrued.

If one adopts the plaintiff's original theory, that after the Interest Period terminated and the Repayment Period commenced, the parties' open-end credit plan ceased and a closed-end credit plan began, the instant action is still time-barred. The statute of limitations for any TILA violation keyed to the Repayment Period began to run on the date Jacobs entered the loan agreement, or when the defendants performed under the agreement by transmitting the loan funds to him. See, e.g., Boursiquot, supra, at 353. According to Jacobs, a closed-end mortgage was issued to him in September 1998. Thus, if Jacobs were correct in holding that view, the statute of limitations would have begun to run, with respect to that closed-end credit arrangement, in September 1998 and expired one year later in 1999. If one adopts the plaintiff's latest theory, that the Equity Source Account Loan was, from its inception, a closed-end credit plan, any claim for a TILA violation accrued on September 27, 1988, the date on which the plaintiff entered the loan agreement. An action based on that claim had to be initiated within one year, that is, 1989. Therefore, under any of the plaintiff's proffered theories, when the instant action was commenced in 2001, it was untimely, unless, as Jacobs maintains, the doctrine of equitable tolling applies to this action and shields his complaint from dismissal by virtue of the running of the statute of limitations.

*Equitable Tolling*

The doctrine of equitable tolling applies to those situations where the plaintiff is unaware of the existence of a viable claim because of a defendant's misleading conduct, or where the plaintiff is "prevented in some extraordinary way" from exercising his rights. Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45, 50 (2d Cir. 1985). "Time requirements in lawsuits between private litigants are customarily subject to 'equitable tolling' where necessary to prevent unfairness to a diligent plaintiff." Haekal v. Refco, Inc., 198 F.3d 37, 43 (2d Cir. 1999)(quoting Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95, 111 S. Ct. 453, 457 [1990]).

In the instant case, the plaintiff alleges in his complaint that beginning on September 10, 1998, and continuing thereafter, Citibank "engaged in schemes and continuous courses of conduct which ignored, avoided, evaded and distorted those required disclosure requirements of the TILA and Regulation Z, which governed the proper determination of the annual percentage rates pursuant to 15 U.S.C.§1606(a)(1)(A)." More specifically, Jacobs alleges, as noted earlier in this writing, that in the Spring of 1998, he sought to determine why his monthly loan repayments would increase from approximately $1,003 to $1,470 during the Repayment Period. He contacted an entity associated with, but separate from Citibank, FSB, as he was invited to do by correspondence he received from FSB concerning his home equity loan. However, Jacobs claims he was "stonewalled whenever [he] was fortunate to communicate with a [FSB] employee." According to the plaintiff, the defendants refused to provide him "any answers for about 2½ years." At that point, apparently convinced that: (a) Citibank would not disclose to him the information that Jacobs believed he needed to understand more fully how the monthly loan

11

repayment amount was being calculated during the Repayment Period; and (b) the requisite information had never been disclosed to him previously, Jacobs commenced the instant action in 2001.

Equitable tolling may be applied to a TILA claim. See Coveal v. Consumer Home Mortgage Inc., No. 04 Civ. 4755, 2005 WL 704835, at *4 (E.D.N.Y. March 29, 2005). "Although the Second Circuit has yet to rule on the matter, the overwhelming authority from other jurisdictions suggests that the inability to discover a nondisclosure is not enough, by itself, to toll the statute." Boursiquot, 323 F. Supp. 2d at 354. Based on the allegations made in the complaint, Jacobs did not receive from Citibank, in 1998, a disclosure statement applicable to a closed-end credit plan, and for 2½ years thereafter, he could not extract that information from the bank. However, "mere nondisclosures provide insufficient grounds for tolling the statute of limitations." Boursiquot, 323 F. Supp. 2d at 354. According to Jacobs, in 1998, he believed he was being "stonewalled" by persons associated with FSB, an entity he concedes is not Citibank and not part of defendant Citicorp.

A fraudulent concealment can provide a basis upon which to toll a statute of limitations in a circumstance "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S. Ct. 582 (1946)(citation and internal quotation omitted). However, concealment by nondisclosure, if that occurred, is not enough. See Boursiquot, 323 F. Supp. 2d at 354. Some trick or contrivance engaged in by the defendants and intended by them to exclude suspicion and prevent inquiry must be shown by the plaintiff to have been perpetrated. See Wood v. Carpenter, 101 U.S. 135, 143 (1879). Jacobs has not met this burden. Jacobs' recounting of his frustration,

occasioned by: (i) a bank's poor customer service performance; and (ii) a bank's foreclosure department's inability to access amortization data is not fraud.  A plaintiff alleging fraud must set forth facts with particularity that support that claim of fraud (see Fed. R. Civ. P. 9[b]), and must establish that a defendant engaged in some "trick or contrivance."  Wood, supra, at 143.  In the case at hand, that has not been accomplished by the plaintiff.  Consequently, the doctrine of equitable tolling cannot be employed in this circumstance to save from dismissal an action that was not commenced within the applicable statute of limitations.  Since this action was not commenced timely, the Court need not reach and analyze that branch of the instant motion through which the defendants assert that summary judgment is warranted based on the plaintiff's failure to state a claim under TILA.

## IV.  RECOMMENDATION

For the reasons set forth above, the plaintiff's complaint should be dismissed because it was not filed within the applicable statute of limitations.

## V.  FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed. S. Rakoff, 500 Pearl Street, Room 1340, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Rakoff.

FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Reynoso, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      August 4, 2005

Respectfully submitted,

/Kevin Nathaniel Fox/
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Mailed copies to:

Damond J. Carter, Esq.
Law Offices of Damond J. Carter, PLLC
58 Beacon Avenue
Albany, NY 12203

Stephen F. Ellman, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022